UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUANITA BALADAD,

        Plaintiff,

    v.

ANDREW SAUL,

        Defendant.

Case No. 19-cv-00246-PJH

**ORDER GRANTING PLAINTIFF'S MOTION AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 21, 27

      Pursuant to 42 U.S.C. § 405(g), plaintiff Juanita Baladad ("plaintiff") seeks judicial review of the Commissioner of Social Security's ("defendant") final decision denying her claims for disability benefits. This action is before the court on the parties' motions for summary judgment. Having considered the parties' motions, the pertinent legal authorities, and having reviewed the administrative record, the court hereby **REMANDS** this action to defendant's assigned administrative law judge for further proceedings in accordance with this order.

## BACKGROUND

**A.    Procedural History**

      On October 27, 2014, plaintiff filed an application for disability benefits under Title XVI, alleging a disability onset date ("AOD") of January 1, 2000. Certified Administrative Record ("AR") 168. Shortly after, on November 20, 2014, plaintiff filed an application for supplemental security income under that same title, alleging the same January 1, 2000 AOD. Id. 290. At core, plaintiff asserts that she is disabled because of her diabetes, obesity, and depression.

      Defendant denied plaintiff's claims both initially and upon reconsideration. Id. 217-

22, 230-35.  On September 21, 2017, Administrative Law Judge David LaBarre (the "ALJ") held a hearing on plaintiff's application.  <u>Id.</u> 19.  At the 35-minute hearing, plaintiff and a vocational expert testified.  <u>Id.</u> 144-166.  Plaintiff answered questions from both the ALJ and her counsel.  <u>Id.</u>  On February 15, 2018, the ALJ issued his decision on plaintiff's application.  <u>Id.</u> 30.  In it, the ALJ concluded that plaintiff was not disabled within the meaning of the federal Social Security laws.  <u>Id.</u> 9.  The Social Security Appeals Council then denied plaintiff's request to review the ALJ decision.  <u>Id.</u> 1-4.

This action followed on January 14, 2019.  Dkt. 1.

**B.    Summary of Plaintiff's Medical History**

Plaintiff is 55 years old.  AR 618.  As a child, she suffered sexual abuse from her alcoholic stepfather and felt neglected by her mother.  <u>Id.</u> 620.  She dropped out of high school, <u>id.</u>, and moved in with her boyfriend when she was 16 years old, <u>id.</u> 619.  They ultimately got married and had three children.  <u>Id.</u>  Plaintiff and her husband had a very good relationship until his death in 2006.  <u>Id.</u> 624. Shortly after his death, plaintiff's 21-year old daughter died.  <u>Id.</u> 619.  Plaintiff's relationship with her remaining children appears emotionally distant.  <u>Id.</u> 620.

Over the course of her life, plaintiff has held only a few sporadic temporary service jobs.  <u>Id.</u> 160.  In 2014, plaintiff lost her apartment for failing to pay rent.  <u>Id.</u> 620.  Since then, plaintiff has gone through some combination of homelessness and living in transitional housing.  <u>Id.</u>

Plaintiff has a history of methamphetamine addiction and cannabis use.  <u>Id.</u> 148.  Plaintiff continues to regularly use cannabis, <u>Id.</u> 157, but stopped using methamphetamines around 2015 or 2016, <u>id.</u> 148.  Aside from certain medications used to treat her depression (Risperidone, Trazodone, and Fluoxetine), <u>id.</u> 412, 633, no record suggests that plaintiff has any other chemical dependencies.

According to a May 6, 2015, examination, plaintiff had a global assessment functioning score ("GAF") of 55, <u>id.</u> 538, which indicates moderate impairments in social and occupational functioning.  Other exams yielded a score of 41 on March 1, 2016, <u>id.</u>

620, and 50 on November 7, 2016, id. 649. The latter scores indicate "serious impairments" to such functioning.[1]

The various health professionals opining on plaintiff's status generally agree that she suffers from depression. June 23, 2014 is the earliest indication that health professionals began treating plaintiff's depression. Id. 410. The severity of plaintiff's depression, as well as the extent of its effect upon her ability to work, is one of the major contested issues in this appeal. In addition to her psychological health, another major issue on this appeal concerns plaintiff's physical abilities. Plaintiff is 5'3'' and weighs over 230 pounds. Id. 152. She has had Type II diabetes since at least 2014, id. 447, which she reportedly takes medication for, id. 618. While plaintiff acknowledges that she can walk and lift without problems, id. 151, she has trouble sitting for more than a couple hours, id., and she cannot stand (without walking) for more than "20, 30 minutes," id. 153.

Since initiating her claim for disability benefits in October 2014, plaintiff has undergone numerous evaluations and treatments concerning her psychological and physical statuses. Such evaluations were by both her regular medical service providers and certain examining professionals. Rather than repeat plaintiff's evaluation and treatment history in this section, the court details such history in its discussion of how the ALJ weighed the evidence when making his disability determination. To the extent necessary, the court will also specify any additional facts in its analysis.

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act provides for the payment of disability insurance benefits to people who suffer from a qualifying physical or mental disability. 42 U.S.C. § 423(a)(1). To evaluate whether a claimant is disabled within the meaning of the Social Security Act,

---

[1] Garrison v. Colvin, 759 F.3d 995, 1003 (9th Cir. 2014) ("A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment. . . . According to the DSM–IV, a GAF score **between 41 and 50** describes 'serious symptoms' or 'any **serious impairment** in social, occupational, or school functioning.' A GAF score **between 51 to 60** describes 'moderate symptoms' or any **moderate difficulty** in social, occupational, or school functioning.").

3

the ALJ is required to use a five-step sequential analysis.  20 C.F.R. § 416.920(a).  The

ALJ may terminate the analysis at any step if it determines that the claimant is or is not

disabled.  Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines whether the claimant has engaged in any

"substantial gainful activity," which would automatically preclude the claimant receiving

disability benefits.  20 C.F.R. § 416.920(b).  If not, at step two, the ALJ considers whether

the claimant suffers from a severe impairment which "significantly limits [her] physical or

mental ability to do basic work activities."  20 C.F.R. § 416.920(c).

At step three, the ALJ is required to compare the claimant's impairment(s) to a

listing of impairments provided in an appendix to the regulations.  20 C.F.R

416.920(a)(4)(iii); 20 C.F.R 416.920(d).   If the claimant's impairment or combination of

impairments meets or equals the severity of any medical condition contained in the

listing, the claimant is presumed disabled and should be awarded benefits.  20 C.F.R. §

416.920(d).

If not, the ALJ goes to step four to consider whether the claimant has sufficient

residual functional capacity to perform her past work despite the limitations caused by the

impairments.  20 C.F.R. §§ 416.920(e)-(f).  An individual's residual functional capacity is

what he can still do in a workplace setting despite his physical and mental limitations.  20

C.F.R. § 416.945.  In determining the residual functional capacity, the ALJ must consider

all of the claimant's impairments, including those that are not severe, taking into account

all relevant medical and other evidence.  20 C.F.R. §§ 416.920(e), 416.945.  If the

claimant cannot perform his past work, defendant is required to determine, at step five,

whether the claimant can perform other work that exists in significant numbers in the

national economy, taking into consideration the claimant's residual functional capacity,

age, education, and work experience.  20 C.F.R. § 416.920(g).

At steps one through four, the claimant has the burden to demonstrate a severe

impairment and an inability to engage in his previous occupation.  Andrews v. Shalala, 53

F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds at step five, the burden shifts to

the defendant to demonstrate that the claimant can perform other work.  Id.

**ALJ'S FINDINGS**

On February 15, 2018, the ALJ issued his decision.  He decided that plaintiff was not disabled, finding that she had the residual functional capacity to perform medium work, AR 23-29, and that there were a significant number of jobs in the national economy that plaintiff could perform, id. 29-30.

**A.      The ALJ's Sequential Analysis**

At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since October 27, 2014.  AR 21.

At step two, the ALJ concluded that plaintiff has several medically determinable impairments, including diabetes mellitus, obesity, major depressive disorder, anxiety disorder, and substance addiction disorder.  Id.  The ALJ stated that these impairments "significantly limit the ability to perform basic work activities as required by SSR 85-28." Id.

At step three, the ALJ concluded that plaintiff failed to satisfy her burden of showing that her impairments met the criteria for demonstrating the requisite severity of the impairments listed at Title 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). Id.  The ALJ considered plaintiff's physical and psychological impairments under Listings 9.00, 12.04, 12.06, and SSR 02-1p, respectively.  Id. 21-23.  Significantly, when considering plaintiff's physical impairments under Listing 9.00 and SSR 02-1p, the ALJ found that, while plaintiff's obesity is severe, there was "no evidence of end organ damage" or diabetes-related complication.  Id. 22.  When considering plaintiff's psychological impairments under Listings 12.04 and 12.06, the ALJ found that plaintiff suffered "some impairment" with respect to understanding and applying information, a "moderate" limitation with respect to interacting with others, a "moderate" limitation with respect to concentrating, and a "moderate" limitation with respect to adapting and managing.  Id. 22-23.

Having found that plaintiff did not qualify as disabled under step three, the ALJ

then determined plaintiff's residual functional capacity. To do so, the ALJ applied the following two-step process:

1. Whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce plaintiff's pain or other symptoms; and

2. Assuming such impairment exists, the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent to which such effects limit plaintiff's functions. Id. 24.

When applying these sub-steps, the ALJ recited plaintiff's hearing testimony concerning her symptoms. Significantly, the ALJ summarized that plaintiff testified to the following:

- She weighs 234 pounds and is 5'3''. She has no problem walking or lifting. There is nothing wrong with her back or hips, but they start to hurt after sitting for a couple hours. Plaintiff's legs and knees similarly become stiff after sitting for such time. She has problems standing due to numbness in her legs and must sit after standing over 30 minutes.

- Her typical day involves eating, taking her medications, showering, reading, going to the library, watching television, and then going to bed. Significantly, plaintiff testified that she reads romance novels for about an hour and a half at a time and is able to read the entire novel and that she goes online to keep in touch with her friends. She shops at the grocery store once per week and occasionally walks around the lake.

- She has trouble concentrating for more than an hour, feels down, has difficulty getting motivated. Her diabetes is not a significant problem unless she fails to monitor her eating.

- She has a long history of using methamphetamines and such use continued until after her 2014 application. She uses marijuana two to three times per week along with her mental health medication. There is no evidence that

plaintiff underwent treatment for her substance abuse. There is also no urinalysis to show "a consistent refrain" from taking methamphetamine. Id. 24-25.

With respect to the first sub-step, the ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause her alleged symptoms." Id. 24. However, with respect to the second sub-step, the ALJ, concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. The ALJ explained that plaintiff's statements concerning such effects are "inconsistent" because "the evidence as a whole, including her testimony, indicates that the claimant remains capable of performing medium work." Id. 25.

The ALJ did not make any express credibility determination in direct support of that explanation. Rather, following his recitation of plaintiff's and the above noted first and second sub-steps conclusions, he summarized various pieces of evidence in the record. Id. 25-29. Significantly, such evidence included plaintiff's testimony concerning her prior methamphetamine use, medical records showing that medications managed plaintiff's depression-related symptoms, as well as certain psychological health related observations and opinions by various treating and examining professionals. Id. The court further details the ALJ's bottom-line determinations on the weight afforded to such opinions in the section immediately below.

At step four, the ALJ determined that plaintiff has no relevant past work. Id. 29.

At step five, based on a vocational expert's testimony, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff could perform given her age, education, work experience, and residual functional capacity. Id. 29-30. The ALJ found that such jobs included working as an industrial cleaner, hospital cleaner, and store laborer. Id. 30.

**B. The ALJ's Weighing of the Medical Opinions and Testimony**

The ALJ considered and weighed the testimony and opinions of several

professionals.  Below, the court details such professionals, their respective opinions, and the weight assigned to each by the ALJ.

### 1.    Dr. Farah Rana, M.D.

On April 20, 2015, Dr. Rana conducted an internal medicine evaluation on plaintiff. In it, Dr. Rana catalogs plaintiff's chief complaints (diabetes, hypercholesterolemia, and schizophrenia/depression), history of present illnesses, family and social history, physical exam observations, and overall impressions.  AR 532-536.  Significantly, concerning her physical exam observations, Dr. Rana notes that plaintiff is "an obese female," "appears older than her age," shows "no lower back tenderness," and her various joints are "all nontender, full range of motion, and no localized inflammation or swelling."  Id. 535.

At the end of her three-page report, she concluded the following concerning plaintiff's functional capacity:

> "The claimant's ability to stand and walk in an eight-hour day is six hours with breaks.  She can sit for six hours with breaks in an eight-hour day.  She can carry 25 pounds frequently and 50 pounds occasionally.  She can push and pull devices up to 50 pounds.  She can handle, manipulate, feel and finger objects without any problem. She can stoop, bend, kneel, crouch, and climb on frequent basis.  She does not need assistive device. She can take public transportation."  Id. 534.

The ALJ gave Dr. Rana the "greatest weight" for opinion evidence, characterizing her opinion as finding that plaintiff "could perform medium work with frequent postural activities" and reasoning that her opinion is "consistent with and well-supported by her own examination . . . as well as the treatment notes in the record" and "further supported by claimant's own testimony that she does not have a problem with walking or lifting."  Id. 26-27.

### 2.    Dr. Phillip Sack, M.D.

On May 6, 2015, Dr. Sack conducted a psychiatric evaluation on plaintiff.  In it, Dr. Sack catalogs plaintiff's family, social, psychiatric, drug, and alcohol backgrounds, as well as observations from plaintiff's mental status exam.  AR 537-38.  Significantly, with respect to his mental exam observations, Dr. Sack notes that plaintiff's affect is "sad and

anxious . . . she appears flat and blunted," her mood is "depressed and anxious," and her insight and judgement are both "fair to poor." Id. 537.  Dr. Sack assigned plaintiff a GAF score of 55. Id. 538.

At the end of his two-page report, he concluded the following concerning plaintiff's functional capacity:

- Plaintiff's ability to appropriately relate to others is "intact."

- Plaintiff's ability to understand and follow simple instructions is "intact."

- Plaintiff's ability to maintain appropriate levels of concentrations, pace, and persistence necessary to perform one or two step simple tasks is "intact."

- Plaintiff's ability to maintain adequate persistence to perform complex tasks is "impaired."

- Plaintiff's ability to tolerate usual stress and pressures associated with daily work activities is "impaired."

- Plaintiff's ability to manage changes in a routine work situation is "impaired."

- Plaintiff's ability to manage funds and perform math are "impaired." Id.

The ALJ gave Dr. Sack "partial weight," reasoning that, "although he provides limitations to the claimant functional abilities and assigns a GAF score of 50 that is on the borderline of moderate to serious symptoms, he did not quantify the limitations he provided." Id. 27.  The ALJ failed to note Dr. Sack's conclusion that plaintiff has an impaired ability to manage funds and perform math.[2]

### 3. Dr. Jodi Snyder, Psy.D.

On October 13, 2015, Dr. Snyder performed a psychological evaluation on plaintiff. In it, Dr. Snyder catalogs plaintiff's chief complaints (depression and anxiety), her general observations, history concerning plaintiff's psychiatric, medical, psychological, social, educational, employment, substance and criminal backgrounds, as well as plaintiff's

---

[2] Contrary to the ALJ's statement, Dr. Sack gave plaintiff a GAF of "55/100," **not** "50/100." Id. 538. That mistake is immaterial because a higher score means higher functional capabilities.

psychological test results.  AR 546-47.

Significantly, with respect to plaintiff's test results, Dr. Snyder notes that she performed a "complete psychological evaluation," which included a Folstein Mini Mental Status Exam ("MMSE"), Wechsler Adult Intelligence Scale exam ("WAIS-IV"), Wechsler Memory Scale exam ("WMS-IV"), and Trails A and B exam.  Id. 547-48.  Dr. Snyder recorded "average" to "borderline"/"low average" results with respect to the various categories of plaintiff's WMS-IV test.  Id. 548-49.  Dr. Snyder recorded "average" to "borderline" results with respect to plaintiff's WAIS-IV test.  Dr. Snyder recorded "average" results with respect to plaintiff's Trail A and B tests. Id. 549.

Dr. Snyder further noted that plaintiff's attention was "adequate-fair" and, with respect to her concentration, was able to spell the word "world" backwards and complete "one serial 7's."  Id. 548.  Dr. Snyder also noted that plaintiff's judgment is "fair," her insight is "fair," her mood is "anxious," her affect is "congruent," and her though process is "linear and logical."  Id.

At the end of her five-page report, she concludes the following concerning plaintiff's functional capacity:

- Plaintiff's ability to follow simple instructions is "unimpaired."
- Plaintiff's ability to follow complex/detailed instructions is "moderately impaired."
- Plaintiff's ability to maintain adequate pace or persistence to perform one or two simple repetitive tasks is "unimpaired" and complex tasks is "moderately impaired."
- Plaintiff's ability to maintain adequate attention/concentration is "mildly impaired."
- Plaintiff's ability to adapt to change in a job routine in "moderately impaired."
- Plaintiff's ability to withstand the stress of a routine workday is "moderately impaired."
- Plaintiff's ability to appropriately interact with others on a regular basis is

1    "moderately impaired."

2 •  Plaintiff's ability to adapt to change, hazards, and stress in a work setting is

3    "moderately impaired.

4 •  Plaintiff's is unable to manage funds. Id. 549-50.

5   The ALJ correctly characterized each of the above determinations by Dr. Snyder.

6 Id. 27. The ALJ gave Dr. Snyder "significant weight," reasoning that "she conducted a

7 thorough evaluation that included testing that revealed relatively normal results that is

8 supported by the overall medical evidence of record including evidence that the

9 prescribed treatment is effective." Id.

10  **4.**  **State Agency Initial Reviewer Dr. D.V. Lucila, M.D.**

11   On December 1, 2015, a non-examining, non-treating state agency medical

12 consultant, Dr. D.V. Lucila ("Dr. Lucila"), completed an initial review of the record to make

13 a determination on plaintiff's disability status. This review included a summary of the

14 then-existing medical opinions concerning plaintiff's residual functional capacity. AR 168-

15 74 (Dr. Snyder October 13, 2015 opinion, Dr. Sack's September 23, 2015 opinion, and

16 Dr. Rana's April 20, 2015 opinion). At the end of the initial review, the Dr. Lucila found

17 that the limitations on plaintiff's physical abilities, understanding, concentration, social

18 interaction, and adaption abilities were either "not significant" or moderate. Id. 179-182.

19 Dr. Lucila also identified specific limitations on physical exertions, including being able to

20 carry no more than 50 pounds occasionally, stand/walk for no more six hours in a regular

21 workday, and sit for no more than six hours in a regular workday. Id. 180. The initial

22 decision by Dr. Lucila concluded that plaintiff did not qualify as disabled for purpose of

23 receiving social security benefits. Id. 184.

24   Lastly, in the records supporting Dr. Lucila's initial decision, there is a July 9, 2015

25 note from a "Tawnya Brode, Psy.D" ("Dr. Brode"). Id. 176. Significantly, Dr. Brode states

26 that "[i]n providing some benefit of the doubt, I will give great weight to the adverse MSS

27 and agree clmnt would be unlikely to sustain a workday/week due to a hx of affective DO

28 as well as likely organic damage from 20+ yrs of meth abuse." Id. 176. The court

addresses this potential internal inconsistency in the initial review in its analysis below.

**5.** **Therapists Mahmood Ketabchi, MFT and Dr. Roya Sakhai, Ph.D.**

On March 1, 2016, Ketabchi, MFT, under the supervision of Dr. Sakhai, conducted a psychological evaluation of plaintiff. In it, Ketabchi, MFT and Dr. Sakhai catalog their general observations of plaintiff, her medical history, her mental health history, her social and family history, her then-existing daily functions, and her diagnostic impressions. AR 618-620. Significantly, as part of her diagnostic impressions, they assign plaintiff a GAF score of 41. Id. 620.

At the end of their five-page report, Ketabchi, MFT and Dr. Sakhai conclude the following concerning plaintiff's functional capacity:

- Plaintiff's ability to understand and remember simple instructions is "limited."

- Plaintiff's ability to execute simple instructions is "limited."

- Plaintiff's ability to make judgments on simple work-related decisions is "limited."

- Plaintiff's ability to understand and remember complex instructions is "marked."

- Plaintiff's ability to execute complex instructions is "marked."

- Plaintiff's ability to maintain concentration, attention, and persistence is "marked."

- Plaintiff's ability to perform activities within a schedule and maintain regular attendance is "marked."

- Plaintiff's ability to complete a normal workday/workweek without interruptions from psychologically based symptoms is "marked."

- Plaintiff's ability to appropriately respond to changes in work settings is "marked." Id. 621.

Based on the above findings, Ketabchi, MFT and Dr. Sakhai concluded that plaintiff's prognosis is "poor, and she will not be able to work on a regular and consistent

basis due to her severe psychopathology." Id. 620.

While accurate, the ALJ summarily characterized each of the above determinations, stating that Ketabchi, MFT and Dr. Sakhai opined that plaintiff "had primarily marked limitations in all areas and that she would not be able to work on a regular and consistent basis due to her severe psychopathology." Id. 27. The ALJ gave "little weight to [their] opinion because it is advocacy." Id. The ALJ explained that while "most of the examinations of the claimant provide for moderate limitations," the evaluation by Ketabchi, MFT and Dr. Sakhai found that plaintiff has "marked limitations in most domain[s] [sic], which is not consistent with the medical record nor the claimant's own testimony." Id. The ALJ observed that, according to plaintiff, "she is able to concentrate well enough to read for an hour and a half and complete reading an entire book, she shows up for therapy without a problem, and no one has noted any kind of issues that claimant has a problem getting along with others in the clinical setting or the setting of the job she briefly worked in 2006." Id.

### 6. Dionne Childs, MS and Dr. Lesleigh Franklin, Ph.D.

On April 28, 2016, Childs, MS, under the supervisions of Dr. Franklin, conducted a psychological evaluation of plaintiff. In it, Childs, MS and Dr. Franklin catalog the procedures they administered to plaintiff to conduct the examination, her background, her educational and work history, her substance abuse history, her medical and psychiatric history, her current situation, their observations of plaintiff's behavior and mental status, and their assessment of her cognitive abilities. AR 623-28.

Significantly, to assess plaintiff's cognitive abilities, Childs, MS, and Dr. Franklin tested plaintiff's intellectual functioning using the Weschler Abbreviated Scale of Intelligence ("WASI"), her neuropsychological functioning (i.e., language, visual abilities, memory and concentration) using the Repeatable Battery for Assessment of Neuropsychological Status ("RBANS"), as well as her emotional functioning using the Miller Forensic Assessment of Symptoms Test ("M-FAST"), Beck Anxiety Inventory ("BAI"), and Beck Depression Inventory ("BDI"). Id. 628. Childs, MS and Dr. Franklin did

United States District Court
Northern District of California

not issue plaintiff a particular GAF score, but noted that their assessment under that rubric "would describe Ms. Baladad as having impairment in social and occupational functioning." Id. 629.

At the end of their seven-page report, Childs, MS and Dr. Franklin attached an appendix concluding the following concerning plaintiff's functional capacities:

- Plaintiff's ability to understand and execute simple instructions is "mildly" impaired.
- Plaintiff's ability to interact and get along with others is "mildly" impaired.
- Plaintiff's ability to accept instructions and appropriately respond to criticism is "mildly" impaired.
- Plaintiff's ability to understand and execute detailed instructions is "moderately" impaired.
- Plaintiff's ability to perform at a consistent pace without unreasonable break periods is "moderately" impaired.
- Plaintiff's ability to maintain concentration for two-hour periods is "markedly" impaired.
- Plaintiff's ability to maintain regular attendance and punctuality is "markedly" impaired.
- Plaintiff's ability to appropriately respond to changes and deal with stress in a routine work setting is "extremely" impaired.
- Plaintiff's ability to complete a regular workday/workweek without interruptions from psychologically based symptoms is "extremely" impaired. Id. 630.

The ALJ correctly characterized each of the above determinations by Childs, MS. and Dr. Franklin. The ALJ assigned Childs MS and Dr. Franklin "partial weight" to their "overall opinion," "significant weight" to that portion of the opinion stating that plaintiff has no more than moderate limitations, and "little weight" to the portion that plaintiff has marked limitations. Id. 27.

The ALJ did not provide justifications for his first two assignments. The ALJ justified assigning "little weight" to portion concerning plaintiff's marked limitations because most of plaintiff's examinations "provide for moderate limitations," "the marked limitations appear to be advocacy," and such limitations are "not supported by the overall medical evidence of record," including, in particular, plaintiff's own testimony. Id. 27-28.

### 7. State Agency Reconsideration Reviewer Dr. Tom Stern, M.D.

On June 13, 2016, another non-examining, non-treating state agency consultant, Dr. Tom Stern, M.D. ("Dr. Stern") issued his decision reviewing Dr. Lucila's initial decision. Similar to the initial review, Dr. Stern's reconsideration decision included a summary of some of the medical opinions concerning plaintiff's functional capacity that existed at the time (adding Ketabchi, MFT and Dr. Sakhai's March 1, 2016 opinion and Childs, MS and Dr. Franklin's April 28, 2016 evaluation). AR 187-203. Except the July 9, 2015 statement by Dr. Brode, Dr. Stern made substantially similar findings with respect to plaintiff's physical, social, and mental limitations (i.e., either "not significant" or "moderate") as those made in Dr. Lucila's initial review. Id. 203-06. The reconsideration decision concluded that plaintiff was not disabled. Id. 209.

The ALJ characterized both Dr. Lucila's and Dr. Stern's decisions as opining that plaintiff "is able to perform the full range of medium exertional [activities]." Id. 28. The ALJ gave "great weight" to these reviewers "because their opinions are consistent with the relevant medical evidence of record and the claimant's reported functionality." Id.

### 8. Unknown Treating Physician at Pathways to Wellness

On November 7, 2016, a purportedly unknown treating physician at Pathways to Wellness met with plaintiff for purpose of refilling her medication. AR 645.[3] In nearly inscrutable handwriting, the physician catalogs plaintiff's history of illness, medical and psychiatric history, physical and sexual abuse history, substance abuse history, and mental status. The physician issued plaintiff a GAF score of 50. Id. 649.

---

[3] Based on the top of the record memorializing plaintiff's meeting, it appears the physician's name may be "Hiawatha Harris, M.D." Id. 645.

At the end of this 6-page record, the physician concludes that plaintiff has "moderate" limitations to her abilities to maintain relationships and to maintain concentration. Id. 649. The physician also concludes that plaintiff's "episodes of decomposition" pose "no" limitations and her ability to conduct daily activities face "no" limitations. Id. The physician did not comment on any other potential limitations.

The ALJ correctly characterized each of the above determinations. The ALJ gave the unknown treating physician at Pathways to Wellness "some weight" because "most of the examinations of the claimant throughout the record provide for no more than moderate limitations." Id. 28.

### 9. Nurse Practitioner Angela Missagia ("Missagia, NP")

On July 5, 2017, Missagia, NP issued a medical opinion regarding plaintiff's ability to do work-related activities. In it, Missagia, NP found that plaintiff could lift/carry objects weighing a maximum of 10 pounds, stand and walk for a maximum of four hours in a regular workday, sit for a maximum of four hours in a regular work day, and occasionally perform certain "postural" activities (e.g., stoop, kneel, crouch). AR 793-94. Missagia, NP also found that plaintiff could sit/stand in only 60-minute periods, id. 793, and that her impairments would make her 10 percent less efficient at work, id. 795.

Except his characterization of Missagia, NP's opinion as finding that plaintiff was limited to "sedentary exertion," id. 28, the ALJ correctly characterized the above findings. The ALJ gave "little weight" to Missaggia, NP's opinion, reasoning that "the overall medical evidence of record, which includes relatively normal physical examinations except for the claimant's obesity and a period of uncontrolled diabetes [sic], does not support it" and plaintiff's impairments, as well as the limitations they cause, "are covered by the medium limitation" that the ALJ previously assessed. Id. 28.

### 10. Therapist Jonathan Willett, MFT ("Willett, MFT") and Dr. Sakhai

On July 11, 2017, Willett, MFT completed a questionnaire concerning plaintiff's mental impairment. In it, Willett, MFT answered questions concerning the onset of plaintiff's impairments, plaintiff's treatment, and her symptoms. AR 796-98. Willett, MFT

noted that plaintiff's impairments would cause her to be absent from work for an average of three days per month and expected that she would be "off-task" approximately 30 percent of a regular workday. Id. 799.

Near the end of the five-page questionnaire, Willett, MFT concluded the following concerning plaintiff's functional capacities:

- Plaintiff's ability to respond to demands is "mildly" limited.

- Plaintiff's ability to adapt to changes is "moderately" limited.

- Plaintiff's ability to manage her psychological-related symptoms is "markedly" limited.

- Plaintiff's ability to distinguish between acceptable and unacceptable work performance is "markedly" limited.

- Plaintiff's ability to set realistic goals is "markedly" limited.

- Plaintiff's ability to independently make plans is "markedly" limited.

- Plaintiff's ability to maintain personal hygiene is "markedly" limited.

- Plaintiff's ability to maintain awareness of normal hazards is "markedly" limited. Id.

While accurate, the ALJ summarily characterized each of the above determinations, stating that Willett, MFT opined that plaintiff "would primarily have moderate to marked limitations in all mental functioning areas" and would "be off-task more than 30 of the day and would miss 3 days per month." Id. 28. The ALJ gave "little weight" to Willet MFT's opinion that plaintiff has marked limitations, reasoning that "there are no progress noted authored by MFT Willett that supports his opinion," he fails to address "the effects of the claimant's meth and marijuana usage," and "there is no evidence to support the onset of these limitations back to claimant's childhood." Id.

## DISCUSSION

### A.    Standard of Review

This court has jurisdiction to review defendant's final decisions pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if his findings are "supported by

substantial evidence and if the [ALJ] applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001). Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). If the evidence is subject to more than one rational interpretation, the court must uphold the ALJ's findings if they are "supported by inferences reasonably drawn from the record." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008). Yet the reviewing court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).

"The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). An ALJ's paraphrasing of record material must be accurate. Reddick v. Chater, 157 F.3d 715, 722-23 (9th Cir. 1998). Although the ALJ can and must weigh conflicting evidence, "he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

Additionally, in the Social Security context, the harmless error rule applies. Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991). Harmless error is an error by the trier of fact that is immaterial and therefore does not justify the reversal or modification of the lower court's ruling. Id. 1131.

**B.    Issues**

Plaintiff seeks an order reversing the ALJ's decision denying her application for disability benefits. In support of her request, plaintiff asserts the following:

1.    The ALJ failed to provide adequate reasons supported by substantial evidence in support of his decision to weight the various professional

opinions concerning plaintiff's impairments.

2. The ALJ erred at step five of the sequential analysis because he failed to ask a complete hypothetical concerning available jobs.

3. The ALJ erred when finding plaintiff's symptom-related testimony was "not entirely consistent with" the other evidence in the record.

4. The ALJ erred by failing to obtain medical expert testimony at the hearing.

5. The court should remand for payment of benefits or, alternatively, further proceedings but require the ALJ to obtain the opinion of a medical expert.

## C. Analysis

### 1. Whether the ALJ Erred When Evaluating Medical Opinions

For claims filed before March 27, 2017, an ALJ applies the rules in Title 20 C.F.R. § 416.927 to evaluate medical opinion evidence. 20 C.F.R. § 416.927 ("For claims filed . . . before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 416.920c apply."). Under this section, an ALJ must consider all medical opinions in the record together with any other relevant evidence received. 20 C.F.R. § 416.927(b).

The Ninth Circuit and applicable regulations distinguish between three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining, non-treating physicians). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996); 20 C.F.R. §416.927(c).

Unless an ALJ allows a treating source's medical opinion "controlling weight" under § 416.927(c)(2), the ALJ generally considers the following factors when assigning weight to any particular medical opinion:

- Examining relationship: An ALJ gives more weight to the medical opinion of a source who has examined the claimant as opposed to one who has not. § 416.927(c)(1).

- Treatment relationship: An ALJ gives more weight to medical opinions from

a claimant's treating source. § 416.927(c)(2).

- Supportability: The more a medical source presents relevant evidence to support a medical opinion or better explains its conclusions, the more weight the ALJ will give that medical opinion. With respect to non-examining source opinions, the weight given will depend on the degree to which they provide supporting explanations for their opinions, including whether they consider all of the pertinent evidence to a claim such as medical opinions of treating and other examining sources. 20 C.F.R. § 416.927(c)(3).

- Consistency: The more consistent a medical opinion is with the overall record, the more weight the ALJ will give that opinion. 20 C.F.R. § 416.927(c)(4).

- Specialization: An ALJ will give relatively more weight to the medical opinion of a specialist about medical issues related to his area of specialty. 20 C.F.R. § 416.927(c)(5).

- Other factors: An ALJ may also consider other factors brought to his attention that tend to support or contradict an opinion. 20 C.F.R. § 416.927(c)(6).

Under § 416.927(c)(2), if an ALJ finds that a treating source's medical opinion on an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, then the ALJ will give it "controlling weight." 20 C.F.R. § 416.927(c)(2). Otherwise, to determine the weight of such opinion, the ALJ must apply the factors listed in § 416.927(c)(2)(i)-(ii) and 416.927(c)(3)-(6). 20 C.F.R. § 416.927(c)(2). In any event, the ALJ must provide "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

The Ninth Circuit acknowledges that that an ALJ may reject an uncontradicted

opinion of a claimant's treating physician only for "clear and convincing" reasons supported by substantial evidence. Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017). In the event an ALJ rejects a treating or examining physician's opinion that is contradicted by another doctor, the ALJ must set forth "specific and legitimate reasons" based upon substantial evidence. Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).

Separate from the three sorts of physician-related acceptable medical sources discussed immediately above, an ALJ may also consider medical opinions from "not acceptable" medical sources. 20 C.F.R. § 416.927(f). When doing so, an ALJ generally applies the same considerations described at § 416.927(c)(1)-(6), although the ALJ need not consider all such factors. 20 C.F.R. § 416.927(f). "Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source." 20 C.F.R. § 416.927(f). Such a finding may be warranted in circumstances where a not acceptable medical source "has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." Id. Relatedly, the Ninth Circuit has ruled that "[a]n ALJ may discount the opinion of an 'other source,' such as a nurse practitioner, if she provides 'reasons germane to each witness for doing so.'" Popa, 872 F.3d at 906.

### a. Whether the ALJ Erred When Limiting the Weight of Ketabchi, MFT's and Dr. Sakhai's Opinion

Here, the ALJ erred because he failed to provide specific and legitimate reasons for limiting Ketabchi, MFT's and Dr. Sakhai's opinion.[4] Such failure is demonstrated by

---

[4] Defendant failed to contest plaintiff's assertion that the "specific and legitimate reasons" standard applies to this opinion. Dkt. 21 at 11; Dkt. 27 at 19-20. Given that failure, as well as the fact that Dr. Sakhai joined Ketabchi, MFT in the opinion, the court will apply the "specific and legitimate" reasons standard here.

multiple shortcomings.

First, although the ALJ discounts this opinion because "most of the examinations of the claimant provide for moderate limitations," AR 27, he does not specify which examinations he referred to. That initial deficiency aside, three of the four medical opinions reflecting opinions adverse to plaintiff's position were dated at least five months **before** Ketabchi, MFT's and Dr. Sakhai's March 1, 2016 evaluation—namely, on April 20, 2015 (Dr. Rana), May 6, 2015 (Dr. Sack), and October 13, 2015 (Dr. Snyder). Plaintiff's limitations could have changed from 2015 to 2016. The ALJ fails to address how the results of such earlier examinations remained an accurate reflection of plaintiff's psychological status.

This failure is particularly significant because three of the examinations conducted **after** Ketabchi, MFT's and Dr. Sakhai's March 1, 2016 evaluation—namely, on April 28, 2016 (Childs, MS and Dr. Franklin), July 5, 2017 (Missagia, NP), and July 11, 2017 (Willett, MFT and Dr. Sakhai)—were either focused on plaintiff's **physical** status (Missagia, NP) or, contrary to the ALJ's conclusion, found that plaintiff faced "marked" or "extreme" psychologically-related limitations (Childs, MS and Dr. Franklin and Willett, MFT and Dr. Sakhai). Id. 630, 799. Relatedly, the sole adverse opinion that occurred after Ketabchi, MFT's and Dr. Sakhai's March 1, 2016 evaluation (the "unknown" treating physician on November 7, 2016), comments on only four general categories relating to plaintiff's physical or psychological limitations. Id. 649. The ALJ fails to address how such relatively fewer categories affect the probative value of this opinion, particularly when compared to the nine categories of more specific limitations evaluated by Ketabchi, MFT and Dr. Sakhai. Id. 621. Because Dr. Snyder's opinion is the only psychological-health related examination that the ALJ could have principally relied upon to discount Ketabchi, MFT's and Dr. Sakhai's opinion, but the ALJ failed to explain how or why the former opinion more accurately reflected plaintiff's then-existing psychological status, the ALJ erred when weighing the Ketabchi, MFT's and Dr. Sakhai's opinion.

Second, the ALJ fails to explain why or which part of Ketabchi, MFT's and Dr.

1   Sakhai's opinion amounts to so-called "advocacy." Id. 27. To the contrary, Ketabchi,

2   MFT's and Dr. Sakhai's opinion appears well-reasoned and based upon a thorough

3   evaluation. Id. 618-622. While plaintiff met with Ketabchi, MFT weekly for therapy at

4   least from June 2015 to December 2015, id. 565-89, and from August 2016 to January

5   2017, id. 740-64, the ALJ fails to identify any specific or legitimate reason to impugn

6   Ketabchi, MFT's credibility because of that longstanding relationship. Relatedly, and as

7   noted by plaintiff and further discussed below, the ALJ showed a notable tendency of

8   describing all opinions contrary to his conclusion as "advocacy." Such trend further

9   belies the validity of his rejection of this opinion.

10      Third, the ALJ's penultimate justification for discounting Ketabchi, MFT's and Dr.

11  Sakhai's opinion—namely that plaintiff testified that she could read romance books for

12  over an hour show up to therapy without trouble, id. 27—is not legitimate. Significantly,

13  the ALJ fails to explain how or why leisurely reading and showing up on time for an

14  appointment once per week undermines a finding of a "marked" limitation in the more-

15  intense sort of concentration or punctuality demanded in the workforce. Absent such

16  explanation, and without additional specific instances of concentration or punctuality, the

17  ALJ's decision to discount those findings on this basis is untenable.

18      Fourth, the ALJ's reliance upon the **absence** of any evidence showing that plaintiff

19  had a "problem getting along with others" is an assertion that, by definition, is not

20  supported by substantial evidence. On this ground, too, the ALJ's decision to discount

21  Ketabchi, MFT's and Dr. Sakhai's opinion is untenable.

22      Fifth, the ALJ failed to address § 416.927(c)(2)'s general presumption that,

23  because of their status as treating professionals, Ketabchi, MFT's and Dr. Sakhai's

24  opinion should receive more weight. As a corollary, although the ALJ decided not to

25  assign Ketabchi, MFT and Dr. Sakhai's opinion "controlling weight," he was nonetheless

26  obligated to analyze the various factors enumerated in § 416.927(c)(2)-(6). 20 C.F.R §

27  416.927(c)(2) ("When we do not give the treating source's medical opinion controlling

28  weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as

23

well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion."). This failure is particularly troubling given the several weeks of treatment progress notes recorded by Ketabchi, MFT that tend to support this opinion.

Given the shortcomings noted above, the ALJ erred when discounting Ketabchi, MFT's and Dr. Sakhai's opinion.

### b. Whether the ALJ Erred by Limiting the Weight of Willett, MFT's and Dr. Sakhai's Opinion

Here, the ALJ erred because he failed to provide legitimate reasons for discounting Willett, MFT's opinion.[5] Such failure is demonstrated by the following shortcomings.

First, Willett MFT provided at least 12 pages of notes detailing plaintiff's progress from February 2017 to May 2017. AR 727-39. While it's possible that these notes do not support Willett's "marked limitations" conclusions, the ALJ fails to explain that possibility.

Second, Willett **does** address the effects of plaintiff's prior drug use. Id. 736 ("Client discussed deaths in her family and long-term addiction and how these impacted her depression.") (emphasis added); Id. 737 (same). As a result, the ALJ's second proffered justification for discounting Willett, MFT's opinion—that he "does not address the effects of the claimant's meth and marijuana usage," id. 28—is incorrect and therefore not legitimate.

Third, there is evidence, detailed in Willett, MFT's notes, to support the conclusion that plaintiff's limitations date back to the purported abuse she suffered as a child. Id. 739 ("Writer supported client with processing memories related to childhood and how they impacted core negative beliefs causing symptoms of depression . . . Client identified being abused as a child and feeling unprotected by her mother as contributing to her

---

[5] In his briefing, defendant implicitly agrees with plaintiff's assertion that the "specific and legitimate reasons" standard applies when evaluating the ALJ's treatment of Willett, MFT's opinion. Dkt. 27 at 20. As a result, the court will apply that standard here.

depression and her life."); <u>Id.</u> 738 (same).  Again, the ALJ plainly mischaracterizes the evidentiary support for Willett's opinion.  As a result, the ALJ's third-proffered justification for discounting Willett's opinion is not legitimate.

Given the shortcoming noted above, the ALJ erred when discounting Willett, MFT's and Dr. Sakhai's opinion.

> **c.**     **Whether the ALJ Erred by Partially Rejecting Childs, MS's and Dr. Franklin's Opinion**

Here, the ALJ discounted Childs MS's marked limitations conclusions based upon similar justifications relied upon to discredit Ketabchi, MFT's and Dr. Sakhai's opinion.[6] Close in time to Ketabchi, MFT's March 1, 2016 evaluation, Childs, MS conducted her psychological evaluation on April 28, 2016, AR 623-31—i.e., several months *after* Dr. Snyder's opinion.  The ALJ also remarks, without explanation, that Childs, MS's and Dr. Franklin's marked limitations conclusions "appear to be advocacy."  AR 27-28.  As a result, the ALJ's treatment of this opinion's marked limitations conclusions faces the same first and second shortcomings noted above with respect to his weighing Ketabchi, MFT's and Dr. Sakhai's March 1, 2016 opinion.

Additionally, as set forth in § 416.927(c)(3), the ALJ should allow more weight to opinions that rest upon more evidence, including "medical signs and laboratory findings." Childs, MS' and Dr. Franklin's appear to have based their opinion on numerous psychological-health related examinations.  <u>Id.</u> 628-30.  The ALJ failed to proffer any legitimate reason specifically addressing why, despite the numerosity and apparent thoroughness of Childs, MS's and Dr. Franklin's examinations, their marked limitation conclusions (and *only* such conclusions) deserved only "little weight."

Lastly, to the extent defendant relies upon Dr. Stern's evaluation to support the ALJ's decision to discount Childs, MS's and Dr. Franklin's "marked limitations"

---

[6] Defendant failed to contest plaintiff's assertion that the "specific and legitimate reasons" standard applies on the basis of Childs' status as an MS.  Dkt. 21 at 13; Dkt. 27 at 18-19. Given that failure, as well as the fact that Dr. Franklin joined in the opinion with Childs MS, the court should apply that standard of review here.

1    conclusions, Dkt. 27 at 19, such attempt fails.  Significantly, in his decision, the ALJ did

2    not express such reliance when discounting this opinion.  Defendant may not offer such

3    justification ex post.  Bray v. Comm'r of Soc. Sec., 554 F.3d 1219, 1225 (9th Cir. 2009)

4    ("Long-standing principles of administrative law require us to review the ALJ's decision

5    based on the reasoning and factual findings offered by the ALJ—not *post hoc*

6    rationalizations that attempt to intuit what the adjudicator may have been thinking.")

7    (emphasis in the original).  Given the above, the ALJ erred when discounting Childs,

8    MS's and Dr. Franklin's opinion.

9                    **d.      Whether the ALJ Erred when Weighing Dr. Snyder's Opinion**

10          Here, plaintiff criticizes the weight assigned by the ALJ to Dr. Snyder's for two

11    reasons.  First, Dr. Snyder, unlike Dr. Franklin, failed to test plaintiff's psychological

12    functioning.  Dkt. 21 at 14.  Second, Dr. Snyder's opinion is not supported by the record

13    overall because such opinion is contradicted by plaintiff's treating therapists and Dr.

14    Sack.  Id.

15          Although plaintiff's criticisms of the evaluations used to support Dr. Snyder's

16    opinions may be well-founded, the ALJ relied upon substantial evidence in support of his

17    decision to credit Dr. Snyder's opinion.  Importantly, the ALJ found that Dr. Snyder's

18    conclusion was based upon a "thorough" evaluation that included testing revealing

19    relatively normal results and supported by the overall medical record.  AR 27.  That

20    characterization of the scope and results of Dr. Snyder's evaluations is sufficiently

21    accurate.  Id. 546-52.  While Dr. Snyder's test "was limited in scope," id. 547, it focused

22    on plaintiff's mental status (the "Folstein Mini Mental Status Exam"), including her

23    intelligence (the "Weschler Adult Intelligence Scale") and memory (the "Weschler

24    Memory Scale"), id. 547-48.  Because the ALJ may reasonably accept such scope as

25    adequate to support his credibility determination, he did not error when assigning Dr.

26    Snyder's opinion "significant weight."  Id. 28.  This conclusion, however, does not salvage

27    the shortcomings identified in connection with the ALJ's treatment of Ketabchi, MFT's and

28    Dr. Sakhai's competing opinion.

### e. Whether the ALJ Erred When Weighing the State Agency Reviewers' Opinions

Here, the ALJ erred when generally assigning "great weight" to the state agency consultants' opinions. Previously noted, those opinions comprise both an initial review and a reconsideration review, the former of which includes conclusions from at least two distinct non-treating, non-examining physicians—Dr. Brode and Dr. Lucila. AR 176. Dr. Brode, giving the "benefit of the doubt," agreed with Dr. Sack that "clmnt would be unlikely to sustain a workday/week due to a [history] of affective DO as well as likely organic damage from 20+ years of meth abuse." AR 176. Dr. Lucila reached the opposite conclusion. Id. ("Clmnt can perform simple work with limited public contact."). When making his credibility determination, the ALJ failed to address this internal inconsistency —much less provide a specific and legitimate reason for adopting the opinion favorable to his ultimate disability determination. Id. 29. Absent such reason, the ALJ erred when generally assigning the state agency reviewers' opinions "great weight."

### f. Whether the ALJ Erred When Weighing Missagia, NP's Opinion

Here, the ALJ erred when discounting Missagia, NP's opinion. Significantly, Missagia proffered her opinion on July 5, 2017. Id. 793. However, the bulk of medical opinions concerning plaintiff's physical status and adverse to her position are based on evaluations that occurred *before* 2016 (Dr. Rana and Dr. Sack). The ALJ fails to provide any germane reason or evidence showing that such evaluations accurately reflected plaintiff's physical status as of late 2017. Id. 28. Such failure is particularly fatal given that certain records made or requested by Missagia, NP detail the sorts of physical deficiencies identified above by plaintiff as of November 2016 or later. Id. 660-63 (November 19, 2016 physical exam records reflecting a "split S1" and enlarged uterus); Id. 711-12 (April 5, 2017 imaging diagnostic report reflecting calcification in the thyroid gland, dense coronary artery calcification, and moderate multi-level degenerative disc space narrowing).

Moreover, the ALJ fails to address the regularity that Missagia, NP meets with

plaintiff, which is an important factor for assigning weight to her opinion under § 416.927(f) ("[I]t may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source.").

Lastly, while defendant argues in its briefing that, as an acceptable medical source, Dr. Rana's contradicting opinion necessarily serves as a germane reason for rejecting Missagia, NP's opinion that, such ex-post justification, again, does not salvage the ALJ's decision on review. Bray, 554 F.3d at 1225. Given the above, the ALJ erred when assigning Missagia, NP's opinion "little weight."

### 2. Whether the ALJ Erred at Step Five of Its Sequential Analysis Finding

"When a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations, the grids are inapplicable" and the ALJ must take a VE's testimony and identify specific jobs. Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988). If defendant cannot meet this burden, then the claimant is "disabled" and entitled to benefits. 20 C.F.R. § 416.920(g); Andrews, 53 F.3d at 1040.

Here, the ALJ erred at step five because he asked an incomplete hypothetical. At step three, the ALJ concluded that, with some qualifications, plaintiff has a residual functional capacity to perform medium work. AR 23. Significantly, such qualifications include that she can "perform simple, routine repetitive tasks in a workplace *without time or production quotas* with only occasional changes to essential job functions." Id. (emphasis added). However, in his question to the vocational expert concerning plaintiff's ability to perform other work available in the national economy, the ALJ asked the following:

> "Q: All right. Assume a hypothetical individual of the claimant's age, education, and work experience who is able to perform medium exertion work activities as defined in the regulations with the following specific limitations.
>
> . . .

> The individual can perform simple, routine, repetitive tasks in a workplace environment **without production quotas**.
>
> . . .
>
> Can the hypothetical individual perform any work?"
> <u>Id.</u> 161 (emphasis added)

In response, the vocational expert stated "[y]es, Your Honor," noting an industrial cleaner, store laborer, and hospital cleaner as a few examples. <u>Id.</u> 162. Plainly, the ALJ's hypothetical omitted the "without a time quota" condition that existed in his qualifications to plaintiff's residual functional capacity.

However, such omission is not fatal to the ALJ's conclusion at step five. While differentiating between a "time quota" and a "production quota" suggests that they measure two different things, a "production quota" generally measures efficiency, which, by any regular definition, accounts for output for each unit of input. At a workplace, the amount of time spent on a task qualifies as one such ordinary unit of input. Given that, the ALJ's imperfect hypothetical implicitly accounted for the "time quota" condition. As a result, the vocational expert's testimony supported the ALJ's conclusion at step five.

### 3. Whether the ALJ Erred by Finding Plaintiff's Symptom Testimony Inconsistent with the Evidence in the Record

When the medical records show that "[a claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [her] symptoms, such as pain," an ALJ "**must then** evaluate the intensity and persistence of [the claimant's] symptoms so that we can determine how [her] symptoms limit your capacity for work." 20 C.F.R. § 416.929(c)(1) (emphasis added). To evaluate such symptoms, the ALJ "consider[s] all of the available evidence from [the claimant's] medical sources and nonmedical sources about how [her] symptoms affect [her]." <u>Id.</u> Such evidence includes medical opinions, 20 C.F.R. § 416.929(c)(1), findings "obtained from the application of medically acceptable . . . techniques," 20 C.F.R. § 416.929(c)(2), and "any other information [a claimant] may submit about [his] symptoms," 20 C.F.R. § 416.929(c)(3).

When making that consideration, an ALJ will look to a claimant's "statements in

relation to the objective medical evidence and other evidence" and "whether there are any inconsistences in the evidence in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4). An ALJ will find that a claimant's symptoms diminish his or her "capacity for basic work activities . . . to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id. SSR 16-3p further provides that, when evaluating an individual's testimony concerning her symptoms, an ALJ may not simply "make a single, conclusory statement" discounting such testimony or only "recite" the factors described in the regulations for evaluating symptoms. SSR 16-3P, "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029, at *9 (Mar. 16, 2016). Rather, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id.

Contrary to defendant's objection,[7] SSR 16-3p did **not** abrogate the long-established Ninth Circuit precedent for evaluating a claimant's subjective testimony. Jerrett v. Saul, 785 F. App'x 378, 379 (9th Cir. 2019) ("There was no change in the controlling law: Social Security **Ruling 16-3p is consistent with existing regulations and this court's precedent**.") (emphasis added). As a result, in the absence of evidence of malingering by a claimant, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Lengenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).

Here, as an initial matter, the ALJ found that plaintiff's "medically determinable

---

[7] "Defendant states [its] objections to the 'clear and convincing' standard because it is inconsistent with the deferential substantial evidence standard . . . Moreover, most of the cases apply this standard to the symptoms analysis were a misapplication of the legal rule under §§ 404.1529, 416.929, **due to the now defunct and rescinded 'credibility' analysis**." Dkt. 27 at 14 n.4 citing SSR 16-3p (emphasis added).

impairments could reasonably be expected to cause the alleged systems." AR 25. As a result, the ALJ was required to evaluate plaintiff's symptom allegations.

At the hearing, plaintiff testified to three categories of symptoms. First, she has trouble concentrating and usually cannot do so for longer than an hour without her mind wandering. Id. 149. Second, she is "depressed" and feels "down." Id. 149-50, 154. Third, plaintiff's back and hips start to hurt after a couple hours of sitting. Id. 151. Relatedly, if she stands for too long, her legs "start to go numb," and she usually needs to "sit down after about 20, 30 minutes." Id. 153. Separately, in her application for disability benefits, plaintiff allege a disability onset date of January 1, 2000. Id. 168.

After reciting plaintiff's testimony on these topics, the ALJ concluded that it was "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Id. 25. The ALJ also characterized her testimony as "inconsistent because the evidence as a whole . . . indicates that the claimant remains capable of performing work." Id.[8]

Rather than offer a category-by-category explanation of why plaintiff's testimony concerning each such category was inconsistent with the other evidence in the record concerning each such topic, the ALJ simply cited an amalgamation of undifferentiated evidence concerning all such topics and then drew the above-referenced conclusion. Shortcomings in the ALJ's analytical rigor aside, the limited number of topics that plaintiff testified to allows the court to nonetheless conclude that the ALJ provided sufficiently specific, clear, and convincing reasons in support of his decision to discount certain categories of plaintiff's testimony—although not others.

To the extent discernable, it appears that the only reason proffered by the ALJ to discount the plaintiff's concentration-related testimony was that Dr. Snyder's testing "revealed that [plaintiff's] cognitive functioning was in the average to borderline range." Id.

---

[8] The ALJ did not suggest that any distinction between his conclusion that plaintiff's symptom-related testimony was "not entirely consistent" with the record evidence and his conclusion that such testimony was "inconsistent" with such evidence. Given that, the court will treat these phrases to mean the same.

26.  However, Ketabchi, MFT and Dr. Sakhai concluded that plaintiff had a "marked" limitation in her ability to maintain concentration.  Id. 621.  The reasons identified by the ALJ for rejecting this conclusion in favor of Dr. Snyder's finding were that their conclusion "is not consistent with the medical record nor claimant's own testimony."  Id. 27.

Aside from Dr. Snyder's opinion, though, the ALJ fails to specify which other portions of the "medical record" Ketabchi, MFT's and Dr. Sakhai's opinions are "not entirely consistent" with.  Id. 27.  Given that predicate failure, and without more, the ALJ's decision to reject plaintiff's concentrated-related testimony does not rest upon clear and convincing reasons.

Additionally, the ALJ's reliance on plaintiff's testimony—namely that plaintiff testified that "she is able to concentrate well enough to read for an hour and a half" and show up for appointments on time, id.—is a non-starter.  Again, the sort of concentration needed to read a romance novel is plainly different than the persistence required to maintain a job in the private sector.

Separately, the ALJ fails to address how or why Dr. Snyder's October 2015 opinion remained valid at the time of his decision in 2018, particularly given that Ketabchi, MFT's and Dr. Sakhai's competing opinion was much more recent (March 2017).   As a result, the ALJ erred when discounting plaintiff's testimony on this topic.

With respect to plaintiff's alleged depression, the ALJ does cite a host of evidence showing that plaintiff's mood improved and stabilized with increased prescriptions and therapy.  Id. 25-26; See, e.g., id. 633-34 (2017 treatment notes from unknown physician reflecting statements by plaintiff that she is "doing okay" and observations that plaintiff "reports ongoing improvement in mood since tapering up Fluoxetine.").  Defendant points this out in its opposition and plaintiff's only reply is that defendant "misstates some of the medical evidence," citing a handful of specific "examples" primarily concerning plaintiff's ongoing sad mood and underactive motor skills.  Dkt. 28 at 8.  Significantly, plaintiff also concedes that medication helped [her] symptoms."  Id.  While the ALJ failed to clearly articulate how the cited evidence of plaintiff's improved mood translated into a reason for

discounting her testimony that she was depressed, the volume of evidence cited in support of that reason after the ALJ's conclusion is convincing and his intent to address plaintiff's testimony on this point is sufficiently apparent to permit review. As a result, the ALJ did not error when discounting plaintiff's testimony on this topic.

With respect to plaintiff's alleged sitting and standing pain, the ALJ observed Dr. Rana concluded that plaintiff could perform medium work with frequent postural activities, and that plaintiff testified that she does not have a problem walking or lifting. AR 26-27. The ALJ's characterization of both pieces of evidence is accurate and plaintiff failed to identify any shortcoming with the ALJ's justification on this point. As a result, the ALJ did not error when discounting plaintiff's testimony on this topic.

Lastly, with respect to plaintiff's alleged onset date, the ALJ observed that the "first available record" reflecting plaintiff's alleged symptoms is dated June 23, 2014 and that, prior to then, she had no history of psychiatric hospitalization. Id. 25. Defendant pointed out that justification in its opposition and plaintiff failed to respond. Dkt. 27 at 10; Dkt. 28 at 8. As a result, the ALJ did not error when discounting plaintiff's testimony concerning her alleged onset date. Given the above, the ALJ erred in part when discounting plaintiff's symptom-related testimony.

### 4. Whether the ALJ Erred by Failing to Obtain Medical Expert Testimony

In her opening, plaintiff argues that the Commissioner of Social Security's Hearings, Appeals, and Litigation Manual ("HALLEX") section I-2-5-34(A)(1) required the ALJ because, by discounting Dr. Franklin's opinion that plaintiff suffered from marked limitations, he necessarily questioned the accuracy of Dr. Franklin's test result. Id. However, the Ninth Circuit has clearly stated that an ALJ is not required to consider the requirements set forth in the Social Security agency's Hearings, Appeals, and Litigation Manual ("HALLEX"). Lockwood v. Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1072 (9th Cir. 2010) ("However, HALLEX does not impose judicially enforceable duties on either the ALJ or this court."). Plaintiff herself concedes this point in her reply. As a result, the ALJ did not error when denying plaintiff's request.

United States District Court
Northern District of California

**5.**      **Whether the Court Should Remand for Payment of Benefits or Further Proceedings**

Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004) (citing Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)).  In contrast, under Harman, the court may credit evidence that was rejected by the ALJ and remand for an award of benefits "if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Benecke, 379 F.3d at 593.

Here, the court remands for further proceedings.  The ALJ failed to provide adequate reasons for the assigned weight to various opinions, including those proffered by (1) Ketabchi, MFT and Dr. Sakhai, (2) Willett, MFT and Dr. Sakhai, (3) Childs, MS and Dr. Franklin, and (4) state agency reviewers.  The ALJ also failed to provide adequate reasons for rejecting plaintiff's testimony concerning her ability to concentrate.

Such failures leave open various outstanding issues.  Such issues include how to weigh the various professional opinions once the ALJ remedies the above referenced deficiencies per opinion and how to weigh plaintiff's testimony concerning her lack of concentration (once the ALJ reweighs the professional opinions).  These issues are evidentiary in nature and therefore the ALJ is best situated to resolve them.

As a result, the court remands for further proceedings in accordance with this opinion.  The court instructs the ALJ to separately analyze and set forth adequate reasons for each shortcoming identified above for each professional opinion and plaintiff's concentration-related testimony.  Following this additional analysis, the ALJ must reweigh each such opinion and plaintiff's testimony on that topic.  After such reassignments, if the ALJ concludes that the record shows that plaintiff suffers from the qualifying "marked" or "extreme" psychological or physical impairments or limitations, the

ALJ must determine that plaintiff is disabled.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **GRANTED** and defendant's cross-motion for summary judgment is **DENIED**. The court **REMANDS** this action to the ALJ for further proceedings in accordance with this order. This order adjudicates all pending motions and closes this case.

**IT IS SO ORDERED.**

Dated: March 30, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge